# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| KOREY FLOYD, | \* | |
| | \* | No. 13-556V |
| Petitioner, | \* | Special Master Christian J. Moran |
| | \* | |
| v. | \* | Filed: March 2, 2017 |
| | \* | |
| SECRETARY OF HEALTH | \* | Attorneys' fees, paralegal billing, |
| AND HUMAN SERVICES, | \* | expert invoice, hours for life care |
| | \* | planner. |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Ronald Homer and Joseph Pepper</u>, Conway & Homer, P.C., Boston, MA, for Petitioner;
<u>Alexis Babcock</u>, United States Dep't of Justice, Washington, DC, for Respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

After receiving compensation, Mr. Floyd requests attorneys' fees and costs in the amount of $128,664.74.  **Mr. Floyd is awarded $126,664.74**.  The reasons for the award and the reasons for the reductions are given below.  In addition, expectations for this firm's invoicing with respect to paralegals are also set forth.

### Background

Mr. Floyd was born in 1971.  Before the vaccinations at issue, Mr. Floyd had a relatively complicated medical history.  <u>See</u>, <u>e.g.</u>, exhibits 5, 17, 20; Am. Pet., filed July 2, 2014, at 2 n.4.  In 2012, Mr. Floyd was receiving Medicaid and

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

earning a relatively modest income from working at a fast food restaurant. Exhibit 37 (damages affidavit). In October 2012, when he was nearly 41, Mr. Floyd received the flu vaccine.

Approximately one month after the vaccination, Mr. Floyd started to experience weakness as well as bowel and bladder problems. Exhibit 5 at 1-3. He remained at a university hospital for 19 days when he was discharged to a rehabilitation facility. Exhibit 12.

While in rehabilitation, Mr. Floyd called the law firm he eventually retained. This call initiated a paralegal's gathering of medical records. Timesheets, filed May 20, 2016. The paralegals, whom the timesheets do not identify, were doing almost all the work with the attorney the law firm assigned to represent Mr. Floyd, Joseph Pepper, responding to occasional questions from Mr. Floyd. The paralegals also took the lead on drafting a skeletal petition. Timesheets (Aug. 2, 2013). Before the petition was filed, Mr. Pepper appears not to have reviewed any medical records.

The law firm submitted the petition on August 8, 2012, and also filed a motion for a subpoena. Coincidentally, the next day, Mr. Floyd, having problems with his kidneys, was discharged from a nursing home. Exhibit 6 and 13.

On September 4, 2013, an initial status conference was held. The primary purpose was to discuss the motion for subpoena because it had not explained why efforts to obtain medical records informally were not successful. On September 27, 2013, Mr. Floyd filed an amended motion. On October 1, 2013, an order authorized subpoenas.

With subpoenas in hand, Mr. Floyd's law firm (more particularly paralegals) obtained more medical records. Mr. Floyd filed a statement of completion on April 9, 2014. Around this time, Mr. Pepper began drafting an amended petition based upon summaries of medical records paralegals created. Timesheets. In a June 2, 2014 status conference, Mr. Pepper confirmed that he was working on an amended petition. He also stated his client would complete a damages affidavit. In this status conference, the Secretary raised the issue of diagnosis, noting whether Mr. Floyd suffered from transverse myelitis or neuromyelitis optica was not clear.

In his report, the Secretary presented his concerns about diagnosis more formally. The Secretary also noted that no treating doctor had connected the flu

2

vaccination to Mr. Floyd's neurologic problems and Mr. Floyd had not retained an expert. Resp't's Rep., filed Aug. 8, 2014. In the ensuing status conference, the Secretary reiterated that diagnosis mattered. Consequently, Mr. Floyd was ordered to obtain a report from an expert that addressed diagnosis. Order, filed August 27, 2014.

The law firm consulted Norman Latov, a neurologist. See Timesheets. Mr. Pepper reviewed the report before it was filed on October 22, 2014. See Timesheets. Dr. Latov opined that the flu vaccine caused Mr. Floyd to suffer transverse myelitis. Exhibit 38.

After Mr. Floyd filed Dr. Latov's report, a status conference was held. In the status conference, the Secretary stated that he was unsure about whether to pursue a resolution based upon the costs and risks to continued litigation. However, the Secretary ultimately chose to explore settlement.

To facilitate assessing Mr. Floyd's damages, the law firm retained a life care planner, Maureen Clancy. The Secretary retained Linda Curtis. Both Ms. Clancy and Ms. Curtis are experienced in the Vaccine Program. The life care planners and the attorneys visited Mr. Floyd's home in May 2015. For Mr. Floyd, Mr. Pepper did not attend; Mr. Ronald Homer did. Timesheets. In the ensuing status conference, the Secretary said that Mr. Floyd's case was not simple.

The complexity of Mr. Floyd's case is reflected in the extensive amount of time paralegals spent in summarizing medical records in April 2015. These medical records from various medical facilities run more than 10,000 pages. Exhibits 42-44. Based upon the information available to him, Mr. Pepper communicated a demand on Mr. Floyd's behalf on May 11, 2015.

The parties spent a few months negotiating. During this time, the Secretary requested updated medical records. Order, filed Aug. 13, 2015. The parties came to an agreement, which they memorialized in a stipulation. The stipulation was incorporated into a decision. Decision, filed May 2, 2016.

On May 20, 2016, Mr. Floyd filed the pending motion for attorneys' fees and costs. Mr. Floyd requested a total of $126,630.98. The components were $92,189.30 in attorneys' fees (including $54,168.40 in paralegal fees) and $34,441.68 in attorneys' costs. Mr. Floyd did not incur any costs personally.

The Secretary filed a response without presenting any specific objection. Citing three cases, the Secretary proposed a reasonable amount for "similar cases" would be $75,000 to $100,000. Resp't's Resp., filed June 6, 2016.

To the Secretary's relatively boilerplate response, Mr. Floyd filed a relatively boilerplate reply. Mr. Floyd specifically noted that the Secretary's proposed range would reduce the attorneys' fees and costs by 21-41 percent. Pet'r's Reply, filed June 17, 2016, at 6. With his reply, Mr. Floyd also filed a motion for supplemental fees, requesting an additional $2,002.50 in fees and $31.26 in costs. The tasks listed were performed between June 1, 2016 and June 17, 2016. They primarily concern steps with processing the judgment. Relatively little time was spent responding to the fee response.[2]

After reviewing the nature of the parties' dispute, the undersigned had questions. These were discussed in a substantive status conference held on January 25, 2017. The views of the Secretary as expressed in this status conference helped narrow the issues in dispute.

## Standards for Adjudication

To determine a reasonable amount of attorneys' fees and costs under the Vaccine Act, special masters follow the lodestar approach, which involves a two-step process. Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1347-48 (Fed. Cir. 2008). The first step involves two elements. The judicial officer determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Therefore, a special master must determine both reasonable hourly rates for attorneys, and reasonable hours for tasks. Second, the judicial officer may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348. Here, because a special adjustment is not needed, the analysis focuses on the lodestar factors: a reasonable hourly rate and a reasonable number of hours.

---

[2] Because the attorneys could anticipate performing steps like sending letters and checks for the Medicaid liens, the attorneys could have (and probably should have) waited to file the motion for attorneys' fees and costs until they accomplished these routine steps.

4

## Analysis

The analysis is primarily contained in two sections: a section on attorneys' fees and a section on attorneys' costs. A third section, which is tangential to the lodestar analysis, discusses the Secretary's proffer of a range based upon similar cases.

### I.     Attorneys' Fees

As set forth in Avera, the factors for determining the lodestar value for an attorneys' work are a reasonable hourly rate and a reasonable number of hours. These are set forth below for both attorneys and paralegals.

#### A.     Reasonable Hourly Rates

Broadly, people in two occupations worked on this case --- attorneys and paralegals. The group of attorneys included five people, all frequent participants in the Vaccine Program and well-known to special masters. They have billed at different rates for work in different years.

The billing rates for these attorneys were found in McCulloch v. Sec'y of Health & Human Servs., No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015) (outlining forum rate ranges based on experience), reconsideration denied, No. 09-293V, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The undersigned followed McCulloch. Dorego v. Sec'y of Health & Human Servs., No. 14-337V, 2016 WL 1635826, at *3 (Fed. Cl. Spec. Mstr. Apr. 4, 2016). The proposed hourly rates remain reasonable.

However, the hourly rates for paralegals stand on a less firm foundation. The law firm's invoice requests that paralegal time be compensated at a rate of $135 per hour for all work performed after McCulloch. The undersigned lacks sufficient information to evaluate the reasonableness of this request.

The basic flaw in the foundation comes from the law firm's failure to identify the paralegal by name. In omitting the paralegal's name (or names), the law firm has not complied with the Guidelines. The Guidelines state: "With regard to attorneys' fees, . . . the person who performed the task . . . must be identified in contemporaneous, dated records." Office of Special Masters, Guidelines for Practice under the National Vaccine Injury Compensation Program (Rev. Ed. 2014) Section X, Chap. 3, ¶ A.

5

When asked about this point in the January 25, 2017 status conference, Mr. Pepper distinguished Guidelines from Rules, intimating that the law firm did not have to comply with the Guidelines. However, the Guidelines "reflect the accumulated wisdom of numerous decisions emphasizing that fee records must be specific." Savin v. Sec'y of Health & Human Servs., 85 Fed. Cl. 313, 316 (2008). More substantively, Mr. Floyd's attorneys argued that special masters do not need to know the identity of a paralegal because the task descriptions allow an assessment of duplicate work and because the paralegals charge the same rate, which was set in McCulloch.

McCulloch provides only limited support. There, the primary dispute was a reasonable hourly rate for seven attorneys. The special master extensively analyzed the evidence and made specific findings for each of the seven. However, the question about paralegal rate was a less prominent aspect of the dispute and, consequently, received proportionately less attention. The special master simply accepted the firm's representations about the firm's paralegals' education, training and experience.

While these representations may be accurate, special masters have no way of confirming their accuracy. Further, transferring the analysis from McCulloch is difficult. McCulloch did not identify the paralegals who worked on that case. Did these unnamed paralegals work on Mr. Floyd's case? The answer is not apparent because the timesheets do not identify the paralegal. Without some basic information, starting with the person's name, special masters cannot easily assess the reasonableness of any proposed rates. For example, what happens when a paralegal joins the firm? Is this less experienced person billed at the same rate? Conversely, what if a paralegal receives advanced training? Should the more accomplished person charge a higher rate? Cf. Guidelines, Section X, Chap. 3 ¶ B.1.a ("The affidavit should include information about the petitioning attorney (e.g. the year of graduation from law school, length of practice, specialties of practice, customary billing practices, and history of hourly rates charged). . . . Similar information concerning other persons whose time is being billed should be provided").

In the January 25, 2017 status conference, Mr. Floyd's attorneys noted that the law firm has not listed paralegal's names for many years and not had any significant problem. This is true. However, for better or worse, special masters are now being forced to resolve more motions regarding attorneys' fees and costs, which include, but are not limited to, requests for paralegal compensation. Thus,

6

the undersigned expects that on a going forward basis, the law firm will identify paralegals by name and provide some information about the qualifications and experience of the paralegal.

It bears emphasis that this expectation will be enforced for future activities. The law firm will not be penalized in Mr. Floyd's case. For the present case and for cases in which the paralegal worked before the date of this decision (and a reasonable time thereafter), the undersigned will use the generic paralegal rates found in McCulloch. However, this decision informs the law firm to revise its billing practice to conform to the Guidelines.[3]

B.   Reasonable Number of Hours

The second element in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary. Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).

The undersigned conducted a line-by-line analysis of all the entries documented in the timesheets, despite the fact that when making reductions, a line-by-line evaluation of the fee application is not required. McCulloch, 2015 WL 5634323, at *5 (quoting Wasson v. Sec'y of Health & Human Servs., 24 Cl. Ct. 482 (1991)).

Site visit. Mr. Homer, who charges approximately $100 more per hour than Mr. Pepper, traveled to and attended the site visit. Arguably, assigning this task to a partner who was less familiar with Mr. Floyd's case was inefficient.

However, in the January 25, 2017 status conference, Mr. Homer and Mr. Pepper explained Mr. Homer's schedule grants him more flexibility. Mr. Pepper's participation would have delayed the site visit and delayed the resolution of the case. In addition, the Secretary's attorney represented that her office sometimes sends different attorneys for visits based upon availability. This explanation is reasonable. All time is credited in full.

---

[3] The requirement to identify a paralegal by his or her name is not burdensome. Other law firms that routinely represent petitioners in the Vaccine Program routinely provide this basic information.

7

Participation of Multiple Attorneys. In addition to the site visit, Mr. Homer charged for performing other tasks that Mr. Pepper could have performed, such as reviewing short orders from status conferences that Mr. Pepper attended. Mr. Floyd does not need Mr. Homer to review these orders, however, as Mr. Pepper manages his docket capably. Besides Mr. Homer, other associate attorneys duplicated work that Mr. Pepper had performed or was capable of performing. The tasks, which do not include the site visit, total approximately 4 hours. Therefore, $1,000 is deducted to account for inefficiencies and duplication of work.

Paralegal Review of Medical Records. Around the time of the site visit and in conjunction with the preparation of a demand, paralegals (again unnamed) spent more than 100 hours summarizing medical records. Given the status of litigation, an investment of this much time appeared questionable.

Again, in the January 25, 2017 status conference, Mr. Floyd's attorney persuasively explained the usefulness of this time. Mr. Floyd noted that a paralegal, who charges a lower rate than an attorney, summarized the records. The updated records could provide information about whether Mr. Floyd suffered from TM or NMO and this diagnosis, in turn, could affect the parties' assessment of the risk of continued litigation.[4] Moreover, before the vaccination, Mr. Floyd was receiving Medicaid benefits. The parties had to address this aspect in their resolution. Importantly, when the Secretary was asked to provide his views, he did not contest the reasonableness of efforts associated with updated medical records in this case. Thus, all time devoted to this task is credited in full.

Secretarial tasks. Activities that are "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989). Attorneys, thus, may not separately charge for clerical or secretarial work because those charges are overhead for which the hourly rate accounts. See Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983).

Here, some tasks performed by paralegals were clerical / secretarial in nature. Examples include scheduling status conferences, organizing exhibits, preparing compact discs, revising a short motion after an attorney's review, and

---

[4] The link between vaccination and transverse myelitis has a greater degree of support than the link between vaccination and NMO.

filing documents through the CM/ECF system. The law firm has charged approximately $500 for these tasks. This much is deducted.

C.   Summary for Attorneys' Fees

For attorneys' fees, a reasonable amount of compensation is $92,691.80 ($92,189.30 + $2,002.50 - $1,000.00 - $500.00).

## II.   Costs

For attorneys' costs, Mr. Floyd originally sought $34,441.68. Mr. Floyd added $31.26 in the motion for supplemental attorneys' fees. Many costs are routine, such as those associated with obtaining medical records. These are documented, are reasonable, and are awarded in full. The two most expensive items are charges for Dr. Latov and Ms. Clancy.

The process for determining a reasonable amount of compensation for retained professionals such as neurologists and life care planners follows the same lodestar method. Experts should present detailed invoices that are created contemporaneously with the hours worked.

Dr. Latov's invoice falls short of the standards for a good invoice. Dr. Latov's invoice contains only three lines. The invoice does not specify when any work was done, only that Dr. Latov must have worked before October 20, 2014, the date of the invoice.

On two occasions, the undersigned has found that an invoice prepared by an expert whom this law firm retained was deficient. On both occasions, the undersigned reduced the hours and in both cases, the petitioner, represented by this law firm, filed a motion for review. In both cases, the Court of Federal Claims denied the motion for review. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 781-83 (2013); Morse v. Sec'y of Health & Human Servs., 89 Fed. Cl. 683 (2009).

Given the outcome in these cases, the law firm's submission of another invoice containing only three lines is bewildering. By not creating an invoice that provides specific information such as dates tasks were performed, Dr. Latov risks having hours deducted. The law firm, too, shares some responsibility for educating Dr. Latov about expectations for invoices and for checking to see if Dr. Latov's invoice complies.

9

Although the brevity of Dr. Latov's invoice is troubling, his invoice is accepted. Mr. Pepper pointed out that the law firm retained Dr. Latov in September 2014. Timesheets p. 50. Thus, even if Dr. Latov did not record his time when he performed the work, his invoice was no more than one month old. Therefore, Dr. Latov is unlike experts who created invoices years after working. In addition, the undersigned's assessment of the time Dr. Latov listed on the invoice is reasonable. Thus, Dr. Latov's time is accepted in full.

This acceptance of Dr. Latov's invoice should not be viewed as a relaxing of an expert's obligation to create reasonably detailed invoices. Experts should list the date they perform tasks. Experts should describe what they are doing with specificity. For example a notation that the expert "reviewed exhibits 1-6" communicates more information than a notation "reviewed medical records." To ensure that Dr. Latov is aware of this order, Mr. Floyd's law firm IS ORDERED to send a copy of this decision to Dr. Latov.

In addition to Dr. Latov, the law firm retained Ms. Clancy. Her responsibility was to prepare a life care plan.

Ms. Clancy has submitted an invoice for $10,102.50. This represents 60.6 hours at $150 per hour plus 13.5 hours spent traveling billed at $75 per hour. The hourly rates are reasonable.

For the number of hours, a question arises. Ms. Clancy's invoice shows that she worked 3,853 minutes. This many minutes is the equivalent of 64.2 hours ($3,853 \div 60 = 64.2$). However, Ms. Clancy has actually billed for 74.1 hours. How did she do that?

Ms. Clancy's practice of always billing 0.1 hours for any task explains the discrepancy. The first three lines illustrate this problem. On January 9, 2015, she spent 1 minute looking at an email from Mr. Pepper. Ms. Clancy charged 0.1 hour for this task. About three hours later on the same day, she spent 1 minute sending Mr. Pepper an email, yet charged 0.1 hour for this task. About two hours later still on the same day, Ms. Clancy spent 1 minute reading an email from Mr. Pepper, saying that he will send information, and again charged 0.1 hours for this task. So, for this three-minute exchange of emails, Ms. Clancy has charged 0.3 hours (18 minutes). Is this reasonable?

10

Billing judgment of professionals suggests that these tasks could have been combined into one entry. <u>Guerrero v. Sec'y of Health & Human Servs.</u>, 124 Fed. Cl. 153, 159 (2015).

Other than this issue with how Ms. Clancy tracks and bills her time, the remaining entries are reasonable. In the January 25, 2017 status conference, the Secretary represented that after consulting with his life care planner, Ms. Curtis, he believed that the hours Ms. Clancy spent were reasonable. The Secretary noted that Ms. Clancy actively participated in the planning process and the time seemed justified.

To account for Ms. Clancy's overcharging of approximately 10 hours, $500 is deducted. This reduction accomplishes "rough justice." <u>See</u> <u>Fox v. Vice</u>, 563 U.S. 826, 838 (2011).

Consequently, for attorneys' costs, **Mr. Floyd is awarded $33,972.94** ($34,441.68 + $31.26 - $500.00).

### III. Secretary's Proposed Range

The foregoing analysis completes the lodestar process, as no adjustment to the lodestar calculation is needed. However, in addition to looking at the information Mr. Floyd has presented, the undersigned has also considered the three cases that the Secretary cited.

Here, the Secretary did not furnish any basis for limiting the award of attorneys' fees and costs to $100,000, much less $75,000. As discussed in the Background section of this decision, Mr. Floyd's case presented issues that necessarily take time to resolve, such as a dispute over the proper diagnosis, the consequential need for updated medical records that were unusually lengthy, and the resolution of a Medicaid lien. Furthermore, when the Secretary was called to provide his opinion about some items that contributed to the relatively high amount of attorneys' fees and costs, such as the amount of time the paralegal spent reviewing medical records and the amount of time Ms. Clancy spent, the Secretary acknowledged the reasonableness of the time spent on those activities.

Although the Secretary's offer of a range was not helpful in determining a reasonable amount of attorneys' fees and costs in Mr. Floyd's case, providing information about the awards of attorneys' fees and costs in similar cases can be helpful. The important qualification is that other cases be "similar." When the

11

Secretary provides ranges, he is encouraged to explain how he has selected cases to present as similar. For example, how did the Secretary narrow the group of cases alleging a flu vaccine caused transverse myelitis to the three cases the Secretary presented? What factors did the Secretary consider in determining whether a case was similar? This information would make the Secretary's position more transparent and, possibly, more persuasive. See Florence v. Sec'y of Health & Human Servs., No. 15-255V, 2016 WL 6459592 (Fed. Cl. Spec. Mstr. Oct. 6, 2016); Kirdzik v. Sec'y of Health & Human Servs., No. 15-98V, 2016 WL 4608171 (Fed. Cl. Spec. Mstr. Aug. 10, 2016).

## Conclusion

Mr. Floyd is entitled to a reasonable amount of attorneys' fees and costs. For the reasons explained above, a reasonable amount is $126,664.74. This shall be paid as follows:

**A lump sum payment of $126,664.74, in the form of a check made payable jointly to the petitioner and the petitioner's attorney, Conway & Homer, P.C., for attorneys' fees and other litigation costs available under 42 U.S.C. § 300aa-15(e).**

In the absence of a motion for review, the clerk of the court is directed to enter judgment herewith.

**IT IS SO ORDERED**.

S/Christian J. Moran
Christian J. Moran
Special Master